Robbie Edwina ELMORE

v.

FLEETGUARD, et al.

Supreme Court of Tennessee,
Special Workers' Compensation
Appeals Panel,
at Nashville.

June 29, 2009 Session.

Nov. 3, 2009.

Order Directing Publication
Dec. 4, 2009.

Frederick R. Baker, Cookeville, Tennessee, for the appellant, Fleetguard.

Craig P. Fickling, Cookeville, Tennessee, for the appellee, Robbie Edwina Elmore.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; and Joshua Davis Baker, Assistant Attorney General, for the appellee, Tennessee Department of Labor and Workforce Development, Second Injury Fund.

## MEMORANDUM OPINION

DONALD P. HARRIS, SR., J., delivered the opinion of the court, in which CORNELIA A. CLARK, J., and JEFFREY S. BIVINS, SP. J., joined.

In this workers' compensation case, the employee, Robbie Edwina Elmore, sustained compensable gradual injuries to her neck, shoulders and arms. The trial court made three separate awards, which totaled 122% to the body as a whole. On appeal, the employer, Fleetguard, and the Second Injury Fund contend that the trial court erred by failing to make a single award pursuant to the concurrent injury rule, and by finding that she was not permanently and totally disabled. We conclude that the concurrent injury rule is applicable. We therefore modify the judgment to award 65% permanent partial disability, and find it unnecessary to address the remaining argument.[1]

### Factual and Procedural Background

Robbie Edwina Elmore was sixty-five years old at the time of the trial. She had worked as an assembler for Fleetguard, a manufacturer of automotive equipment, since 1979. Prior to that time, her main work experience had been as a waitress. She had attended school through the eighth grade and also had attended a vocational school where she studied typing and related subjects. Prior to the events at issue in this case, she had a compensable injury with Fleetguard which had resulted in a workers' compensation award of 35% permanent partial disability to both arms in 1973.

In January 2003, she gave her employer notice of a gradually occurring injury to her right hand. The "incident report" completed at the time describes the injury as: "Noticed lump center of right hand." Fleetguard provided a panel of physicians. She initially chose Dr. Toney Hudson, but later requested a second panel, and transferred her care to Dr. Douglas Weikert. Dr. Weikert did not testify, but at least some of his records were attached as exhibits to the deposition of another physician. From those records, it appears that he diagnosed a duPuytren's contracture of the right hand, which was not work-related, and also tendinitis of both elbows. He treated the tendinitis conservatively, primarily with injections.

On October 8, 2003, Ms. Elmore reported a second gradual injury to Fleetguard. The incident report completed at that time describes her condition as "left hand pain, elbow pain (both), arms and shoulders." Fleetguard provided another panel of physicians, from which she selected Dr. Richard Williams, an orthopaedic surgeon. Dr. Williams first examined Ms. Elmore in January 2004. His diagnosis was "complex upper extremity pain," a condition which "involves a variety of issues, including muscloskeletal problems, tendinitis, bursitis, and potential neurologic issues, such as nerve compression." Because Dr.

---

1. This workers' compensation appeal has been referred to the Special Workers' Compensation Appeals Panel of the Supreme Court in accordance with Tennessee Code Annotated section 50–6–225(e)(3) for a hearing and a report of findings of fact and conclusions of law.

Weikert was already treating Ms. Elmore's elbow problems, Dr. Williams initially limited his treatment to her shoulders. He ordered conservative treatment, consisting of injections, medications, and work restrictions.

In April 2004, Dr. Williams performed a "mini-open" rotator cuff repair on Ms. Elmore's right shoulder. She reached maximum medical improvement from that surgery on September 30, 2004. He assigned an anatomical impairment of 13% to the body as a whole, and placed permanent restrictions upon her activities. Those restrictions were: "[A] ten-pound lift limit, no repetitive motions, no heavy push-pull, no above shoulder or overhead lifting, no lifting away from the body."

Ms. Elmore filed suit against Fleetguard and the Second Injury Fund in June 2004. The complaint alleged: "On or about July 28, 2003, Plaintiff, Robbie Edwina Elmore, while employed for the Defendant, Fleetguard, and while performing work arising out of and in the course and scope of her employment sustained an injury by accident to her neck and both upper extremities due to repetitive work activities at Fleetguard." The complaint also alleged that "she has sustained a permanent injury to her neck and both upper extremities." Fleetguard filed an answer to the complaint which denied that it had sufficient knowledge or information to form a belief as to the truth of those allegations.

In early 2005, Ms. Elmore filed a motion requesting that Dr. Weikert be relieved as a treating physician, and Dr. Williams be designated as her treating physician for all purposes. Her motion stated, in pertinent part: "On or about July 28, 2003, [Ms. Elmore] sustained a work-related injury to her neck and both upper extremities due to repetitive work as a result of her work activities with [Fleetguard]." The reason for the requested change was that Dr. Weikert was located in Nashville, nearly one hundred miles from Ms. Elmore's residence, and it would be easier for her to receive all of her care from Dr. Williams, who was located nearby in Cookeville. The motion further stated that she wanted Dr. Williams to treat her "elbows and wrists which are a part of this case."

Fleetguard opposed the motion. It offered another panel of physicians, located nearer to Ms. Elmore than Dr. Weikert. It noted that Ms. Elmore had selected Dr. Weikert from a panel of physicians, and also stated that: "The hands/upper extremity injuries are a separate claim from the shoulder injuries, and they have been treated as such by the parties throughout this case." The trial court granted Ms. Elmore's motion, and Dr. Williams began treatment of Ms. Elmore's elbows and wrists in April 2005. He concluded that she had lateral epicondylitis of both elbows. He also found tendinitis of both wrists, which may have progressed to carpal tunnel syndrome.

In March 2006, Dr. Williams performed a left shoulder arthroscopy and left carpal tunnel release. These procedures were performed simultaneously. On May 31, 2006, he performed an arthroscopic procedure on her right elbow and a right carpal tunnel release. These surgeries were also performed simultaneously. In July 2006, he performed an arthroscopic procedure on Ms. Elmore's left elbow. No additional surgical procedures were performed after that date. Dr. Williams assigned additional impairments of 11% to the body as a whole for Ms. Elmore's left shoulder problems; 15% (9% to the body as a whole) to each arm for carpal tunnel syndrome and epicondylitis. According to the AMA Guides to the Evaluation of Permanent Impairment, these impairments combine for a total of 36% to the body as a whole. It was Dr. Williams' opinion that all of

these conditions were related to Ms. Elmore's repetitive work activities. The permanent restrictions recommended by Dr. Williams for Ms. Elmore remained the same as those placed upon her after her right shoulder surgery.

Ms. Elmore was also referred to Dr. Robert Davis, a neurosurgeon, in November 2004 for evaluation of her neck. She related to him that she had been experiencing gradually increasing neck pain since July 2003. Dr. Davis' diagnosis was cervicalgia or cervical radiculopathy. He referred her to her primary care physician for symptomatic treatment, and assigned a 5% permanent anatomical impairment. Combined with the impairments assigned by Dr. Williams, this results in a total impairment of 39% to the body as a whole. Dr. Davis was also of the opinion that her condition was caused by the repetitive nature of her work.

Ms. Elmore was off work after her first surgery in April 2004. When she returned, she was placed in a light duty position. The duties of this job involved placing small pieces of metal into a machine which then formed them into set screws. After one month in that position, she took a voluntary layoff, which was scheduled to last for approximately a year. In May 2005, she returned to work at a second light duty job. This job consisted of sitting in a chair and examining oil filters which passed by on a conveyor. The purpose was to determine that a gasket was properly placed on the filter. She was not required to handle the filters in any way. After two and one-half weeks, she left this position "because of a constant pain in [her] back every night." Ms. Elmore has not been employed, or sought employment since that time. She applied for and received social security disability benefits. Her husband suffers from Alzheimer's disease, and Ms. Elmore devotes most of her time to assisting him with his activities of daily living.

Michael Galloway, a vocational evaluator, testified on behalf of Fleetguard. He performed academic testing of Ms. Elmore which showed that she was able to read on a high school level, and to perform arithmetic at a fourth grade level. She had no transferrable skills. Mr. Galloway believed that Ms. Elmore was permanently and totally disabled.

In light of the position which Fleetguard had taken in response to Ms. Elmore's motion to transfer her medical care to Dr. Williams, the trial court found that the doctrine of judicial estoppel barred Fleetguard from contending that Ms. Elmore had sustained a single injury, rather than multiple injuries. It found that the Second Injury Fund was not estopped from taking this position, however. The trial court nonetheless ruled that Ms. Elmore had suffered three separate injuries on three separate dates. It found that she was not permanently and totally disabled and awarded 55% permanent partial disability to "each upper extremity" for an injury of January 29, 2003; 50% permanent partial disability to the body as a whole for the injury to Ms. Elmore's shoulders on October 8, 2003; and 17% permanent partial disability for the injury to her neck that it found she had sustained January 26, 2004. The total award for the three injuries amounted to 122% to the body as a whole. The trial court found Fleetguard was liable for 65% permanent partial disability and the Fund was liable for the remaining 57% permanent partial disability. Fleetguard has appealed, asserting that the trial court erred by making three separate awards for permanent partial disability, and by finding that Ms. Elmore was not permanently and totally disabled.

## Standard of Review

The standard of review of issues of fact is de novo upon the record of the trial court accompanied by a presumption of correctness of the findings, unless the preponderance of evidence is otherwise. Tenn.Code Ann. § 50–6–225(e)(2) (Supp. 2008). When credibility and weight to be given testimony are involved, considerable deference is given the trial court when the trial judge had the opportunity to observe the witness' demeanor and to hear in-court testimony. *Whirlpool Corp. v. Nakhoneinh,* 69 S.W.3d 164, 167 (Tenn.2002). Where the issues involve expert medical testimony that is contained in the record by deposition, determination of the weight and credibility of the evidence necessarily must be drawn from the contents of the depositions, and the reviewing court may draw its own conclusions with regard to those issues. *Bohanan v. City of Knoxville,* 136 S.W.3d 621, 624 (Tenn.2004); *Krick v. City of Lawrenceburg,* 945 S.W.2d 709, 712 (Tenn.1997); *Elmore v. Travelers Ins. Co.,* 824 S.W.2d 541, 544 (Tenn.1992). A trial court's conclusions of law are reviewed de novo upon the record with no presumption of correctness. *Perrin v. Gaylord Entm't Co.,* 120 S.W.3d 823, 826 (Tenn.2003); *Ganzevoort v. Russell,* 949 S.W.2d 293, 296 (Tenn.1997).

## Analysis

### 1. Separate Awards

Fleetguard and the Fund contend that the trial court should have applied the "concurrent injury rule," [2] and made a single award, rather than three separate awards. In the circumstances of this case, this argument involves two distinct issues: (a) application of the doctrine of judicial estoppel, and (b) a factual determination as to whether Ms. Elmore's injury, or injuries, resulted in "concurrent disabilities."

■ (a) *Judicial Estoppel.* The trial court ruled that Fleetguard, but not the Fund, was barred by the doctrine of judicial estoppel from arguing that a single award should be made. The court stated:

"[Ms. Elmore] indicated that these were separate injuries, and [Fleetguard] agreed that these were separate injuries and stated thus in their pleadings or in their information that they provided in the case. The Court recognizes that Ms. Elmore relied upon the representation by [Fleetguard] that these were separate incidents. And when [Fleetguard] tried to change their position ... [Ms. Elmore] was prejudiced as a result."

These statements concern the proceedings on Ms. Elmore's motion requesting that Dr. Williams be authorized to provide all of her care, described previously. On the basis of that ruling, the trial court made three separate awards, as described above.

The trial court erred in its application of judicial estoppel in this case. The Supreme Court has recently stated that "judicial estoppel is applicable only when a party has attempted to contradict by oath a sworn statement previously made." *Cracker Barrel Old Country Store, Inc. v. Epperson,* 284 S.W.3d 303, 315 (Tenn. 2009). (emphasis omitted). Statements made by counsel for the parties in connection with Ms. Elmore's motion, Fleetguard's response to that motion, or in other pleadings, were unsworn, and therefore do not provide a basis for application of judicial estoppel. The only sworn statements remotely related to the issue are contained in Fleetguard's responses to Ms. Elmore's interrogatories. Such statements likewise do not provide a basis for

---

**2.** Tenn.Code Ann. § 50–6–207(3)(C) (2008).

raising judicial estoppel. *See* Tenn. R. Evid. 803(1.2) advisory commission comments.

In addition, it must be noted that Ms. Elmore explicitly alleged in her original complaint, and in her motion to have her medical care transferred to Dr. Williams, that she had sustained a single injury.[3] Her position at trial and on appeal is that she suffered three separate and distinct injuries. We can find no basis in the record, to permit her to change her position on the issue while forbidding the opposing party from doing so. We therefore hold that the Fleetguard was not barred from arguing that the concurrent injury rule applies in this case.

■ (b) *Concurrent Injury Rule.* The injuries at issue in this case are all gradually occurring injuries, caused by Ms. Elmore's repetitive use of her hands and arms in the course of her employment. Fleetguard argues that the trial court should have applied the concurrent injury rule found in Tennessee Code Annotated section 50–6–207(3)(C) (2008). That Code section provides in pertinent part: "When an employee sustains concurrent injuries resulting in concurrent disabilities, such employee shall receive compensation only for the injury that produced the longest period of disability. . . ." As Fleetguard points out, several recent decisions of Workers' Compensation Appeals Panels have consistently held that the concurrent injury rule applies when gradual injuries to different body parts are caused by work activity conducted over the same time period.

In *Lane v. Perdue Farms, Inc.,* No. M2008–00235–WC–R3–WC., 2009 WL 1099276 (Tenn.Workers Comp.Panel Apr.24, 2009), the employee suffered gradually occurring hand and shoulder injuries. The Workers' Compensation Panel found that the employee had sustained gradual injuries to different body parts "caused by the same activity conducted over the same time period" and that the concurrent injury rule applied. *Id.* at *3.

In *Ayers v. Cracker Barrel Old Country Store, Inc.,* No. E2007–00077–WC–R3–WC, 2008 Tenn. LEXIS 775 (Tenn. Workers' Comp. Panel June 11, 2008), *review denied,* 2008 Tenn. LEXIS 745 (Sept. 26, 2008), the employee filed separate suits for carpal tunnel injuries to her hands and tarsal tunnel injuries to her feet. The panel held the trial court correctly held these injuries to be concurrent because "both [injuries] were caused gradually by the duties of her job, carried out over the same period of time." *Id.* at *13. The panel rejected the argument that her injuries were separate because they were caused by different activities, i.e. the injuries to her hands by repetitive use of her hands and the injuries to her feet by standing and moving about. *Id.* at *15.

In *Clardy v. TRW Commercial Steering Division,* No. M2006–01261–WC–R3–WC, 2007 WL 4730083 (Tenn.Workers Comp.Panel Nov.6, 2007), the employee sustained gradual injuries to his right shoulder, right arm and thumb, and left arm. The panel found the evidence was "to the effect that these gradual injuries were caused by the same activity, conducted over the same period, and manifested themselves at more or less the same time." *Id.* at *5. Consequently, the panel held the concurrent injury rule applied and re-

---

**3.** Ms. Elmore's emphasis, and that of the trial court, on the question of whether there was a "single injury," or "separate injuries," is misplaced. The appropriate question is whether or not the injuries were "concurrent" under Tennessee Code Annotated section 50–6–207(3)(C), and therefore required a single award of benefits.

versed the trial court's awards for separate injuries. *Id.*

In *Reagan v. Transcontinental Insurance Co.,* No. M2006–00009–WC–R3–CV, 2006 WL 3804402 (Tenn.Workers Comp.Panel Dec.27, 2006), a trial court made separate awards for a gradually occurring left hand injury that manifested itself in the Spring of 2003 and a gradually occurring left shoulder injury that first manifested itself in August 2003. An examining physician testified both injuries were the result of the increased use of the employee's left hand and arm due to a prior injury to her right shoulder. The Workers' Compensation Appeals Panel reversed the separate awards, holding that section 50–6–207(3)(C) required a single "body as a whole" award encompassing both gradual injuries. *Id.* at *4.

Ms. Elmore argues that the injuries are separate and distinct because they arose at different times. She cites *Scales v. City of Oak Ridge,* 53 S.W.3d 649 (Tenn.2001) in support of her position. In that case, the employee had carpal tunnel syndrome. After she had surgery for that condition, she returned to work. She then tripped and fell, injuring her back. The employer argued that a single award should have been made. Both the trial court and the Supreme Court disagreed, finding the injuries to be separate. *Id.* at 652–53. *Scales* differs from this case in that Ms. Scales' second injury was the result of a specific, identifiable, traumatic event. In contrast, all of Ms. Elmore's injuries in this case occurred gradually as a result of the same repetitive activities.

During his deposition, Dr. Williams discussed the interrelationship of the gradual injuries at issue here. He stated:

My perspective on a problem, or problems such as Ms. Elmore has, is that I have an umbrella term which I call complex upper extremity pain and, as I mentioned, it can involve a number of entities, which can each, in its own right, become the preeminent pain that a patient experiences at a given time and there is a tenuous interrelationship certainly of all of these conditions because they all exist in the same upper extremity in the same person who is doing the same types of repetitive motion, but I don't think it's wrong at all to consider them as separate conditions, and I guess, if you will, separate injuries.

There is a semantic issue here because I think it's—we think of an injury typically as something where someone trips and falls, and puts out their wrist and breaks the bone. That's an acute injury and very well-defined. It's very easy to understand.

Something like carpal tunnel syndrome may be a progressive problem precipitated by tendinitis, and as it worsens, the patient may initially have some hints of discomfort, maybe a little tingling. Maybe it comes and goes, but they don't really think much of it until it reaches a certain critical point, and everybody has a different threshold, I guess, if you will, of concern.

\*       \*       \*

It's difficult to pinpoint a calendar date with cases such as carpal tunnel, and even in shoulder impingement, or in tennis elbow. . . .

The injuries for which Ms. Elmore seeks workers' compensation benefits were reported to Fleetguard at the same time. Her initial injury report to Fleetguard was dated January 29, 2003, and states that she "noticed [a] lump center of right hand." That condition, however, was found to be not work-related. Her second injury report, in October 2003, referred to "left hand pain, elbow pain (both), arms and shoulders." This report is the only

report of the injuries for which she seeks benefits and is supported by her complaint for benefits which alleges that, on July 28, 2003, she "sustained an injury by accident to her neck and both upper extremities due to repetitive work activities at Fleetguard."

The first physician to evaluate Ms. Elmore for her work-related conditions was Dr. Hudson on July 31, 2003. His notes state that she gave him a history of "painful pressure" in her right hand beginning in January 2003 which she noted "while picking up some [parts] ... She did not notice any further problems until about two to three weeks ago, when she again noticed some discomfort in her right hand." Dr. Hudson found that she had duPuytren's contracture, a condition which was not related to her work. He also ordered nerve conduction studies and x-rays which revealed mild carpal tunnel syndrome and mild degenerative arthritis of the cervical spine.

Dr. Weikert began to treat Ms. Elmore in September 2003. In addition to Dr. Hudson's diagnoses, he found that she had tendinitis of both elbows. He treated her with physical therapy and injections.

Dr. Williams first examined Ms. Elmore on January 13, 2004. His note states that Ms. Elmore told him: "Her [bilateral shoulder] pain has been gradually worsening since July of this year." The note states that Dr. Williams explained to Ms. Elmore that "[he frequently sees] an overlap between lateral epicondylitis and shoulder weakness and that [he thinks] shoulder weakness may precipitate lateral epicondylitis in many cases, as it forces the individual to rely more heavily on elbow manipulation when the shoulders are weak and painful." In his note of his next contact with Ms. Elmore, on February 10, 2004, he commented that "[he believes] the neck is probably playing a role as well."

Ms. Elmore was referred to Dr. Davis for evaluation of her neck in November 2004. At that time she gave a history of "mechanical neck pain and right extremity pain which she relates to an on-the-job injury with repetitive lifting in July 2003."

Our assessment of the medical evidence in this case is that the histories given by Ms. Elmore to the various physicians who treated her indicates she began experiencing significant symptoms with her various injuries in July 2003. It is clear from Dr. Williams' testimony that all of these symptoms were the result of anatomical conditions caused by the same set of repetitive work activities carried out by Ms. Elmore over the course of her employment. The medical treatment for those conditions included a variety of procedures. Beginning in April 2004, those procedures included multiple surgeries. After that time, she was unable to return to work, other than two brief attempts at light duty.

We find Ms. Elmore sustained gradual injuries that were caused by the same activity, conducted over the same period, and manifested themselves at more or less the same time. As have the other recent Workers' Compensation Panels cited above, we conclude that the concurrent injury rule applies in this case. Accordingly, the trial court should have made a single award of permanent partial disability benefits apportioned to the body as a whole, covering all of Ms. Elmore's injuries.

Having reached that conclusion, we find that it is not necessary to address Fleetguard's contention that the trial court erred by failing to find that Ms. Elmore was permanently and totally disabled. Fleetguard's position is based upon Tennessee Code Annotated section 50–6–207(4)(A)(i), which limits awards of permanent total disability to workers who sustain

compensable injuries after the age of 60 to 260 weeks of benefits. In *Vogel v. Wells Fargo Guard Services,* 937 S.W.2d 856, 862 (Tenn.1996), the Supreme Court held that, in order to avoid an irrational result, the statute would be interpreted to limit awards of permanent partial disability in a similar fashion.

In this case, Ms. Elmore has sustained injuries to both arms, both shoulders and her neck. The medical impairments alone from those injuries amount to 39% to the body as a whole. The trial court explicitly found that she is unable to work at any full-time job. She has limited education, and her work experience is all in unskilled jobs. Based upon these facts, we have no difficulty in finding that her work-related injuries have resulted in a permanent partial disability of at least 65% to the body as a whole, which is the maximum permissible award. A finding of permanent total disability would not affect the amount of the award. Further, if Ms. Elmore were found to be permanently and totally disabled, Fleetguard would remain liable for the entire award, pursuant to Tennessee Code Annotated section 50–6–208(a). *See, Roper v. First Presbyterian Church,* No. M2007–02287–WC–R3–WC, 2008 WL 5101006, *3–4 (Tenn.Workers Comp.Panel Dec.4, 2008).

## Conclusion

The judgment of the trial court is modified to award 65% permanent partial disability to the body as a whole to Ms. Elmore, to be paid entirely by Fleetguard. The Second Injury Fund is dismissed from this action without liability. The judgment of the trial court is affirmed in all other respects. The case is remanded to the trial court for the entry of an appropriate order. Costs are taxed to Robbie Edwina Elmore, for which execution may issue if necessary.

## JUDGMENT

PER CURIAM.

This case is before the Court upon the entire record, including the order of referral to the Special Workers' Compensation Appeals Panel, and the Panel's Memorandum Opinion setting forth its findings of fact and conclusions of law, which are incorporated herein by reference.

Whereupon, it appeals to the Court that the Memorandum Opinion of the Panel should be accepted and approved; and

It is, therefore, ordered that the Panel's findings of fact and conclusions of law are adopted and affirmed, and the decision of the Panel is made the judgment of the Court.

Costs will be paid by Robbie Edwina Elmore, for which execution may issue if necessary.

IT IS SO ORDERED.

## ORDER

PER CURIAM.

It appears to the Court that the Judgment was filed in this matter on November 3, 2009, in which the panel's findings of fact and conclusions of law were adopted and affirmed and the decision of the Panel made the judgment of the Court. The Court directs the publication of the opinion of the Special Workers' Compensation Appeals Panel at Nashville, June 29, 2009, Session.

IT IS SO ORDERED.